## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

**EBRAHIM GHOROUNI DELCHEH,**
**Individually and as Personal Representative**
**of the ESTATE OF HAMED**
**GHOROUNI DELCHEH**

18414 Chalet Drive
Unit 103
Germantown, MD 2084

      Plaintiff,

v.

**UNITED STATES OF AMERICA**

<u>Serve</u>:
Civil Process Clerk
U.S. Attorney for the District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, MD 21201

United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530,

      and

**DEPUTY DOMENIC MASH,**
*in his individual capacity*,

<u>Serve</u>:
Office of General Counsel
U.S. Marshals Service
Building CS-4, Suite 100
Washington, DC 20530-1000,

      Defendants.

Case No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW, Plaintiff Ebrahim Ghorouni Delcheh, by and through his undersigned counsel, on his own behalf and as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, and brings this Complaint against the Defendants, the United States of America, pursuant to the Federal Tort Claims Act (FTCA), and Deputy Domenic Mash, in his individual capacity pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1981). Plaintiff alleges as follows:

## NATURE OF THE CASE

1.      On July 20, 2022, at approximately 9:26 A.M., Montgomery County Sheriff's Office ("MSCO") deputy and U.S. Marshals Capital Area Regional Fugitive Task Force ("CARFTF") member Domenic Mash shot and killed Hamed Delcheh ("Hamed").

2.      The killing of Hamed Delcheh occurred around the 100 block of Garth Terrace in Gaithersburg, Maryland.

3.      Defendant Mash also shot Hamed's father, Plaintiff Ebrahim Delcheh ("Plaintiff" or "Mr. Delcheh"), twice in the leg during this incident.

4.      Prior to his death, Hamed struggled with bipolar disorder and schizoaffective disorder. These conditions caused Hamed to suffer considerable confusion, and at times, hallucinations.

5.      During a mental health crisis in 2020, Hamed crashed his car into a neighbor's home. No one was injured. Hamed was placed on probation.

6.      In the Summer of 2022, Hamed's mental health declined, and he was unable to meet conditions of his probation, including reporting to volunteer work five (5) days per week and appearing at weekly court hearings.

7.    After Hamed failed to appear at a court hearing on July 15, 2022, a Mental Health Judge issued a bench warrant for his arrest for violating his probation.

8.    Aware that he was in violation of his probation, on July 20, 2022, Hamed called his attorney and said that he wanted to surrender to the Mental Health Court so he could be committed to a mental health facility for treatment.

9.    Unbeknownst to Hamed, his state court warrant had been "adopted" by a federal task force (the CARFTF), and ten (10) armed officers were preparing to surround the home where Hamed was staying and take him into custody.

10.    These law enforcement officers were aware that Hamed Delcheh did not have a violent criminal history, and that he suffered from mental health issues.

11.    Upon information and belief, these officers had no tactical plan for de-escalating the situation given Hamed's mental health history.

12.    Upon information and belief, most of the CARFTF officers carried firearms and were not equipped with less-than-lethal weapons. Deputy Mash carried only a firearm and had no less-than lethal weapons on his person.

13.    Less than an hour after Hamed called his lawyer about his desire to surrender, he was shot and killed by Deputy Mash while CARFTF attempted to execute Hamed's arrest warrant.

14.    The Plaintiff, Mr. Delcheh, now brings this action against the United States and Defendant Deputy Mash, arising from the unreasonable and excessive force used against both Hamed and the Plaintiff.

## THE PARTIES

15.     Plaintiff Ebrahim Ghorouni Delcheh is a natural adult person and a resident of the State of Maryland. Mr. Delcheh is the surviving father of Hamed Ghorouni Delcheh, deceased, and is the Personal Representative of the Estate of Hamed Delcheh.

16.     Defendant the United States of America is a sovereign government that has consented to be sued for civil damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2871, *et seq.*

17.     The United States of America operates and oversees the United States Marshals Service (USMS), which is a federal law enforcement agency of the United States Department of Justice.

18.     At all times relevant hereto, the United States acted through its agents, including Defendant Mash, who at the time of the events giving rise to Plaintiff's claims, was a member of CARFTF, which was created pursuant to the authority of the USMS to investigate fugitive matters and locate and apprehend fugitives.

19.     Defendant Domenic Mash is a natural adult person who is a sworn law enforcement officer of the Montgomery County Sheriff's Office, an agency of the government of Montgomery County, Maryland.

20.     At the time of the events giving rise to the Plaintiff's claims, Defendant Mash was acting as a Special Deputy Marshal and thus under the color of law of the United States.

21.     Defendant Mash is being sued in his individual capacity pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), because he shot and killed Hamed Delcheh while executing a criminal warrant that had been "adopted" by CARTF.

## JURISDICTION, VENUE, AND NOTICE REQUIREMENTS

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a), because Plaintiff's claims arise under the Fourth Amendment the United States Constitution and are brought pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80 and 28 U.S.C. § 1346(b)(1), because this is a civil action against the United States for personal injury caused by the negligent or wrongful act or omission of an agent of the United States Government while acting within the scope of his agency, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

23. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the State of Maryland and in this Court's judicial district.

24. Plaintiff has exhausted his administrative remedies under the Federal Tort Claims Act, 28 U.S.C. § 2675. On June 28, 2024, Plaintiff timely and adequately provided notice of the injuries and claims alleged herein by Plaintiff and the Estate to the U.S. Marshals Service, as required by the Federal Tort Claims Act.

25. More than six (6) months have passed with no response from the United States, thus giving rise to Plaintiff's claims under the Federal Tort Claims Act.

## FACTS

**"I don't want you to hurt my son . . . Please don't kill my son."**

*– Ebrahim Ghorouni Delcheh, July 20, 2022*

26.    Hamed Ghorouni Delcheh, age 35 at the time of his death, struggled with bipolar disorder and a schizoaffective disorder, conditions that caused him confusion, hallucinations, and, at times, the inability to comprehend basic things.

27.    During a mental health crisis in 2020, Hamed crashed his car into a neighbor's home.  No one was injured.  As a result, Hamed was placed on probation and ordered to participate in certain treatment and other programs designated by the Montgomery County Mental Health Court.

28.    Hamed's struggles with his mental health continued in the months that followed. During this time, Hamed struggled to comply with the terms of his probation, including keeping a regular volunteer work schedule at a local store and attending court hearings every Friday. Hamed's mental health issues often prevented him from maintaining a job or remembering appointments.

29.    On May 20, 2022, Hamed failed to appear at a scheduled court hearing. The court issued a bench warrant, and Hamed was arrested a few days later without incident. Hamed spent two days in the Montgomery County Detention Center and was released.

30.    At a hearing on June 3, 2022, Hamed admitted to violating his probation, and the Court ordered that his probation be continued. The Court expanded his mandated voluntary work to five days per week.

31.    Because of his declining mental health, Hamed was unable to meet the demands of this volunteer schedule. On Friday, July 15, 2022, Hamed went to the Mental Health Court for his

weekly scheduled court hearing. The organization where Hamed was volunteering had complained that he had missed several shifts, and Hamed's public defender told him the Court was "going to send him back to jail." At this, Hamed became visibly upset and emotional, and he walked out of the courtroom.

32.     As a result, the Montgomery County Circuit Court issued a second bench warrant for his arrest for failure to appear. The warrant indicated that Hamed Delcheh would be returnable before a Mental Health Court Judge only.

33.     On Monday, July 18, 2022, an MCSO sergeant asked Defendant Deputy Mash to check for Hamed Delcheh's vehicle at an address in Germantown, Maryland. Deputy Mash did not see the car that evening, but the following morning he asked the MCSO to send more information on Hamed.

34.     Deputy Mash went to multiple addresses associated with Hamed on Tuesday, July 19, 2022, but he did not find him or his car.

35.     Deputy Mash was aware that the warrant was for failure to appear, that Hamed did not have a violent criminal history, and that he suffered from mental health issues.

36.     Although Hamed's warrant was from Maryland state court, CARFTF "adopted" the case on the evening of July 19, 2022, pursuant to U.S. Marshals Service policy.

37.     CARFTF officers were briefed on the reason for the warrant and Hamed's known mental health history at around 7:30 A.M. on the morning of July 20, 2022.

38.     The task force members executing the warrant for Hamed's arrest on July 20, 2022 were comprised of state and federal actors.

39.     Deputy Mash was the designated "case agent" responsible for coordinating the attempt to arrest Hamed, because Deputy Mash was the officer most familiar with Hamed and the warrant for his arrest.

40.     Upon information and belief, the CARFTF officers engaged to apprehend Hamed that morning did not have a tactical plan for de-escalating the situation and bringing Hamed in safely, given his lack of a violent criminal record and known mental health history.

41.     Upon information and belief, most of the officers engaged to apprehend Hamed were not equipped with less-than-lethal weapons such as a Taser or OC (oleoresin capsicum) spray.

42.     On the morning of July 20, 2022, Hamed called his attorney, Richard Finc, and stated that he wanted to surrender to the authorities so he could be committed to a mental health facility. Mr. Finc told Hamed that he would pick him up and take him there himself.

43.     At approximately 8:15 A.M. that morning, the Plaintiff, Mr. Delcheh, received a telephone call from officers with the U.S. Marshals Service. Mr. Delcheh was informed that officers were looking for his son because he had violated the terms of his probation.

44.     Mr. Delcheh was not home at the time, but he drove home to meet the officers.

45.     The officers did not display their badges or present Mr. Delcheh with a warrant.

46.     Mr. Delcheh was fully cooperative with the officers because he did not want his son to get hurt.

47.     Mr. Delcheh explained to the officers that Hamed was "sick" and needed mental health treatment.

48.     He repeatedly pleaded to the officers: "*I don't want you to hurt my son … Please don't kill my son.*"

49.     Mr. Delcheh began to unlock the front door of his home. An unknown officer stopped him and said "give the key to us." The officer took the key from Mr. Delcheh and opened the door.

50.     The officers searched Mr. Delcheh's home and discovered that Hamed was not there.  Deputy Mash told Mr. Delcheh to call Hamed.

51.     Mr. Delcheh called Hamed, as instructed. Hamed answered and told Mr. Delcheh he was at a friend's house. He said "Dad, come over." Hamed did not know Mr. Delcheh was surrounded by law enforcement officers.

52.     Mr. Delcheh cooperated by voluntarily getting into a cruiser with Deputy Mash and directed the officers to Hamed's friend's house.

53.     During the drive, Mr. Delcheh repeated his entreaty, "*Please don't kill my son*."

54.     Shortly before 9:00 A.M., Mr. Delcheh and the task force officers arrived at a house in the 100 block of Garth Terrace, in Gaithersburg, MD.

55.     When they arrived, the task force officers did not establish any kind of tactical plan as to how to proceed or discuss the use of crisis intervention techniques given Hamed's known issues with mental health.

56.     Because Mr. Delcheh had doubts about the officers' ability to de-escalate the situation, he asked to go inside the home alone.

57.     With Deputy Mash's permission, Mr. Delcheh entered the home to speak with Hamed.  Hamed soon realized that the police were outside after Deputy Mash called Mr. Delcheh on his cell phone.

58.     Mr. Delcheh left the home and met Deputy Mash outside.

59.     Up until this point, the other nine (9) CARFTF officers had been waiting inside their vehicles, without any tactical plan.

60.     After Mr. Delcheh left the home, the CARFTF officers exited their patrol vehicles and positioned themselves to surround the front and back of the townhome.

61.     The officers were visibly armed, many of them wore tactical vests, and several carried ballistic shields.

62.     Upon information and belief, when Hamed saw the nine (9) armed law enforcement officers assembled outside and surround the home, he believed that he was under attack. Hamed grabbed a kitchen knife, jumped out of a window, and began to run up the street, *away* from the group of nine task force officers.  The officers pursued Hamed.

63.     One task force officer deployed a taser at Hamed.

64.     Upon information and belief, shortly thereafter, Hamed dropped the knife and continued running up the hill on Garth Terrace.

65.     Hamed ran past his father and Deputy Mash, and both men began following him.

66.     At this point, Hamed was an unarmed man without a history of violence running away from the officers. He posed no threat to the officers, the community or himself. Several officers raised their firearms and pointed them at Hamed as he ran away from them.

67.     Mr. Delcheh ran ahead of Deputy Mash and reached out for his son. Hamed had his back to Mr. Delcheh and the officers as he ran up the street.

68.     Mr. Delcheh grabbed hold of his son from behind. At this moment, Deputy Mash fired *eight gunshots within three seconds* at Hamed, striking Hamed four times.

69.     The bullets struck Hamed in his left arm, both legs, and his torso.

70.     Two bullets also struck Plaintiff.

71.     At the time Deputy Mash shot Hamed four times, Hamed was not holding a knife or a weapon of any kind.

72.     Deputy Mash did not provide any audible, verbal warning that he was about to use deadly force before he opened fire, nor did any other officer provide such a warning. Neither Hamed nor Mr. Delcheh were warned they were about to be fired upon.

73.     In the moments before the shooting, Mr. Delcheh had repeatedly shouted, "don't shoot!"

74.     The bullet that struck Hamed's torso entered from the left side of his back, halfway between his hip and his shoulder. This bullet traveled back to front, left to right, and upward, injuring multiple ribs and both lungs, and causing massive bleeding within Hamed's chest cavity.

75.     The shot to Hamed's left thigh traveled back to front, left to right, and downward, injuring his femur.

76.     The shot to Hamed's right thigh traveled back to front and upward.

77.     The shot to Hamed's left arm traveled left to right and upward, passing through his arm and into his abdominal cavity, injuring a rib, lung, multiple vertebrae, and his esophagus.

78.     Mr. Delcheh suffered two gunshot wounds to his posterior thigh—one medial and the other lateral.

79.     Hamed collapsed to the ground immediately after he was shot four times.

80.     In the seconds that followed, Mr. Delcheh searched Hamed's body, looking desperately and frantically for any sign of life from his son.

81.     Paramedics arrived at 9:32 A.M., and Hamed was pronounced dead on scene at 9:47 A.M.

82.     Mr. Delcheh was transported to the hospital to treat gunshot wounds to his leg.

83.     The kitchen knife was ultimately found *32 feet* from Hamed's body.

84.     Defendant Mash did not have any less-than-lethal weapons such as a Taser or OC (oleoresin capsicum) spray on his person at the time.

85.     USMS regional fugitive task forces like the CARFTF are intended to "combine the efforts of federal, state, and local law enforcement" to locate fugitives and assistant in "high profile investigations."[1]

86.     Although CARFTF is a federal task force, it is comprised of roughly 200 officers detailed from multiple federal, state, and local law enforcement agencies. CARFTF may execute active arrest warrants out of either state or federal courts.

87.     In January 2021, a Memorandum of Understanding (MOU) was executed between the U.S. Marshals Service and MSCO regarding MCSO's participation in the CARFTF. The MOU provides that participating agencies agree to refer cases to the CARFTF, with cases being adopted by the task force at the discretion of the chief investigator/commander.

88.     The MOU provides that "[t]argeted crimes will primarily include violent crimes against persons, weapons offenses, felony drug offenses, failure to register as a sex offender, and crimes committed by subjects who have a criminal history involving violent crimes, felony drug offenses and/or weapons offenses."[2]  Hamed Delcheh met none of these criteria.

89.     This task force's mission (as stated on its own website) is to "locate and apprehend the most violent and dangerous fugitives throughout the Washington D.C. metropolitan area, Maryland, and Virginia."[3]

---

[1] *USMS Fugitive Task Forces*, U.S. MARSHALS SERVICE, *available at* https://www.usmarshals .gov/what-we-do/fugitive-investigations/fugitive-task-forces (*last accessed* Feb. 26, 2025).

[2] The MOU between MCSO and the USMS is attached to this Complaint as Exhibit A.

[3] *Supra* n. 1.

90.    Hamed Delcheh was not considered one of the most violent persons or dangerous fugitives in the DC metropolitan area; he was a man suffering from mental illness with no history of criminal violence, who was serving probation with a "low" level of supervision and who, on the morning of July 20, 2022, had contacted his legal counsel wishing to surrender to the Court so he could be committed to a mental health facility and obtain treatment.

91.    Research has shown that 17 percent (17%) of use-of-force cases involve a person with a serious mental illness, and such individuals face *11.6 times* the risk of experiencing a police use of force faced by persons without a serious mental illness.[4]

92.    In recent years, persons with mental illnesses have accounted for between 20 and 35 percent of individuals killed by law enforcement.[5]

93.    Deputy Mash and the other responding task force officers were aware that Hamed Delcheh had no violent criminal history, that he had a history of mental health issues, and that the warrant for Hamed's arrest was for failure to appear in court (a minor crime) and was returnable only to a Maryland Mental Health Court Judge.

94.    The primary goal of law enforcement assisted diversion (LEAD) model programs such as Montgomery County's Mental Health Court is to improve public safety by reducing

---

[4] Laniyonu, A. & Goff, P. (2021). *Measuring Disparities in Police Use of Force and Injury Among Person with Serious Mental Illness*. BMC Psychiatry, 21.

[5] Kimberly Kindy et al., *Fatal police shootings of mentally ill people are 39 percent more likely to take place in small and midsized areas*, WASHINGTON POST, Oct. 17, 2020, https://www.washingtonpost.com/national/police-mentally-ill-deaths/2020/10/17/8dd5bcf6-0245-11eb-b7ed-141dd88560ea_story.html.

recidivism and reduce the harms experienced by individuals with mental health disabilities who encounter the police.[6]

95.     The CARFTF officers tasked with bringing Hamed Delcheh into custody failed to adhere to generally accepted principles of law enforcement relating to interactions with persons facing a mental health crisis.

96.     When dealing with persons facing a mental health crisis, law enforcement officers should use nonviolent strategies and techniques to *decrease* the intensity of the situation, assume a "quiet nonthreatening manner when approaching," and, where possible, eliminate commotion and crowds before engaging with such persons.[7]

97.     Rather than de-escalate a tense situation with an individual known to be undergoing a mental health crisis, the CARFTF officers amplified the intensity of the situation by showing up to arrest Hamed Delcheh in large numbers, while visibly armed and wearing military-style tactical gear and carrying ballistic shields, and thereafter, surrounding the home where Hamed was staying.

98.     A reasonable law enforcement officer in this situation would appreciate that engaging a mentally unwell individual in such a manner could cause them to decompensate further, increasing the risk of harm to that individual.

---

[6] *See, e.g., Mental Health Court*, MONTGOMERY COUNTY, MD STATE'S ATTORNEY'S OFFICE, *available at* https://www.montgomerycountymd.gov/SAO/other/mentalhealthcourts.html (last accessed February 28, 2025).

[7] *See, e.g., Model Policy: Responding to Persons Affected by Mental Illness or in Crisis*, IACP NATIONAL LAW ENFORCEMENT POLICY CENTER (January 2014), *available at* https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/IACP%20Mental %20Illness%20Policy.pdf (last accessed February 28, 2025).

99.     As alleged above, the CARFTF officers engaged to apprehend Hamed Delcheh had

no tactical plan for addressing Hamed's known mental health issues and to bring him into custody

safely, given those known issues.

100.    The task force did not implement crisis intervention techniques or, upon

information and belief, utilize any Crisis Intervention Team (CIT) trained officers.

101.    USMS Policy Directive 2.10 [Use of Force] provides that the use of force by USMS

personnel must be objectively reasonable under the totality of the circumstances, that officers are

authorized to use less-than-lethal devices "when the use of verbal commands or physical control

techniques have not or reasonably will not achieve the law enforcement objective," that deadly

force may only be used when necessary to prevent "imminent danger of death or serious physical

injury," and that "deadly force may not be used solely to prevent the scape of a fleeing subject or

prisoner." *See* Exhibit B (USMS Policy Directive).

102.    This USMS Policy further provides that, where possible, a verbal warning to submit

to the authority of the officer shall be given prior to the use of deadly force. *Id*.

103.    The MOU between MSCO and the U.S. Marshals Service incorporates by reference

U.S. Department of Justice Policy Statements on the use of less than lethal force. *See* Exhibit A.

These DOJ policy directives provide that deadly force should not be used against persons whose

actions are a threat solely to themselves and authorize the use of less-than-lethal devices in

situations where, based on the totality of the circumstances, it is necessary to effect an arrest, obtain

compliance from a subject, or protect a person from physical harm.

104.    Despite the fact that task force officers were explicitly authorized to use less-than-

lethal weapons in appropriate situations, Deputy Mash was armed only with a firearm and did not

have any less-than-lethal weapons on his person.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Hamed Delcheh's Rights Under the Fourth Amendment to the United States Constitution**
***Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)**

**(The Estate of Hamed Delcheh v. Defendant Mash, in his Individual Capacity)**

105.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

106.    At all times relevant hereto, Hamed Delcheh had a constitutionally protected right under the Fourth Amendment to the United States Constitution to be free from excessive force and other unreasonable governmental searches and seizures.

107.    At the time he was fatally shot, Hamed was not holding a weapon, and in fact, had dropped the kitchen knife he was holding more than 30 feet from where he was shot.

108.    At the time Hamed was fatally shot, he had his back to the CARFTF officers, including Defendant Mash, and was running away from the officers.

109.    At the time Hamed was fatally shot, he did not pose an unreasonable or imminent threat to life.

110.    Defendant Deputy Mash unreasonably used deadly force against Hamed Delcheh by shooting him eight times in three seconds, when he was unarmed, running away from the officers, and not an imminent threat to Deputy Mash or anyone else.

111.    The aforesaid actions and conduct of Deputy Mash, in firing eight shots in three seconds, in failing to provide a verbal warning before opening fire, and in failing to make any attempt to de-escalate the situation or to equip himself and utilize any less-than-lethal weapons before opening fire, with knowledge that Hamed was suffering from a mental health crisis and had

no violent criminal history, violated Hamed's Fourth Amendment constitutional right to be free from excessive force and unreasonable government seizure.

112.    Deputy Mash's actions were objectively unreasonable and a violation of Hamed Delcheh's clearly established constitutional rights under the Fourth Amendment to the U.S. Constitution.

113.    It was clearly established as of July 20, 2022 that it would be unreasonable for a law enforcement officer to use deadly force on a fleeing, unarmed subject, particularly where the subject is accused of a minor crime.

114.    The aforesaid actions and conduct of Deputy Mash were taken under color of federal law because Deputy Mash was engaged in executing an arrest warrant that had been "adopted" by the U.S. Marshal's Capital Area Regional Task Force and Deputy Mash had been deputized as a Special Deputy U.S. Marshal at the time.

115.    The aforesaid violation of Hamed Delcheh's Fourth Amendment constitutional right to be free from excessive force and unreasonable governmental seizure gives rise to a cause of action and civil remedy under *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971).

116.    This case does not present a new context that is meaningfully different from the existing scope of remedies under *Bivens*, as *Bivens* has been applied to Fourth Amendment claims arising from federal law enforcement agents' excessive force and unreasonable search and seizures of subjects of arrest.

117.    The actions by Defendant Mash did not involve any facts or concerns that would weigh against providing or extending a *Bivens* remedy to Plaintiff, nor would this *Bivens* action interfere with the functioning of the Executive Branch.

118.    The aforesaid actions and omissions of Defendant Mash directly and proximately caused damage to Hamed Delcheh in the form of significant bodily injuries, pain and suffering, fright and terror, severe emotional distress, loss of dignity, and, ultimately, his untimely death.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, demands judgment against Defendant Deputy Mash, in his individual capacity, in an amount to be determined at trial, plus interest, costs, punitive damages, injunctive relief, and any other such relief as the Court deems proper.

<u>**COUNT II**</u>

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Assault**

**(The Estate of Hamed Delcheh v. the United States of America)**

119.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

120.    By deploying his firearm and firing eight shots at Hamed Delcheh, Defendant Deputy Mash placed Hamed in a reasonable fear or apprehension of bodily injury.

121.    If the United States were a private person, it would be liable to the Estate of Hamed Delcheh under the laws of the State of Maryland for assault.

122.    Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to the Estate for its claims under Maryland law.

123.    The aforesaid actions and omissions of Deputy Mash directly and proximately caused damage to Hamed Delcheh in the form of significant bodily injuries, pain and suffering, fright and terror, severe emotional distress, loss of dignity, and, ultimately, his untimely death.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, demands judgment against the United States of America in

an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT III

### Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80
### Assault

### (Plaintiff Ebrahim Ghorouni Delcheh, in his Individual Capacity v. The United States of America)

124.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

125.    By deploying his firearm and firing multiple gunshots at Mr. Delcheh, Defendant Deputy Mash placed Mr. Delcheh in a reasonable fear or apprehension of bodily injury.

126.    If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for assault.

127.    Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to Plaintiff for his claims under Maryland law.

128.    The aforesaid actions and omissions of Deputy Mash directly and proximately caused damage to the Plaintiff in the form of bodily injuries, pain and suffering, fright and terror, loss of dignity, and severe emotional distress.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, in his individual capacity, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT IV

### Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80
### Battery

### (The Estate of Hamed Delcheh v. the United States of America)

129.     Plaintiff hereby incorporates the preceding paragraphs as if restated fully herein.

130.     By deploying his firearm and striking Hamed Delcheh four times, Defendant Deputy Mash intentionally and non-consensually caused a harmful and/or offensive physical touching of the person of another.

131.     These contacts were not justified by officer safety or public safety, or by any legitimate law enforcement purpose.

132.     If the United States were a private person, it would be liable to the Estate of Hamed Delcheh under the laws of the State of Maryland for battery.

133.     Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to the Estate for its claims under Maryland law.

134.     The aforesaid actions and omissions of Deputy Mash directly and proximately caused damages to Hamed Delcheh in the form of significant bodily injuries, pain and suffering, fright and terror, severe emotional distress, loss of dignity, and, ultimately, his untimely death.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT V

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Battery**

**(Plaintiff Ebrahim Ghorouni Delcheh, in his Individual Capacity v. The United States of America)**

135.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

136.    The aforesaid actions and conduct of Defendant Deputy Mash constitute battery under the laws of the State of Maryland. By deploying his firearm and striking Plaintiff twice, Deputy Mash intentionally and non-consensually caused a harmful and/or offensive physical touching of the person of another.

137.    These contacts were not justified by officer safety or public safety, or by any legitimate law enforcement purpose.

138.    If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for battery.

139.    Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to Plaintiff for his claims under Maryland law.

140.    The aforesaid actions and omissions of Defendant Mash directly and proximately caused damage to Plaintiff in the form of bodily injuries, pain and suffering, fright and terror, loss of dignity, and severe emotional distress.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, in his individual capacity, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT VI

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Intentional Infliction of Emotional Distress**

**(The Estate of Hamed Delcheh v. the United States of America)**

141.     Plaintiff hereby incorporates the preceding paragraphs as if restated fully herein.

142.     By deploying his firearm and striking Hamed Delcheh four times, Defendant Deputy Mash through his extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Hamed, in his final moments as he lay dying in the street.

143.     The aforesaid conduct of Deputy Mash was so extreme and outrageous that it exceeded or went beyond all possible bounds of decency, was completely violative of human dignity, and is regarded as atrocious and utterly intolerable in a civilized community.

144.     If the United States were a private person, it would be liable to the Estate under the laws of the State of Maryland for intentional infliction of emotional distress.

145.     Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to the Estate of Hamed Delcheh for its claims under Maryland law.

146.     The aforesaid actions and omissions of Deputy Mash directly and proximately caused Hamed Delcheh to suffer severe emotional distress, fear and terror, mental anguish, and pain and suffering in his final moments.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT VII

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Intentional Infliction of Emotional Distress**

**(Plaintiff Ebrahim Ghorouni Delcheh, in his Individual Capacity v. The United States of America)**

147.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

148.    By deploying his firearm and striking Plaintiff twice, and Hamed Delcheh four times, Defendant Deputy Mash through his extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

149.    Deputy Mash's extreme and outrageous conduct caused the Plaintiff to endure great pain and suffering and caused him to watch his son die before his eyes.

150.    The aforesaid conduct of Deputy Mash was so extreme and outrageous that it exceeded or went beyond all possible bounds of decency, was completely violative of human dignity and is regarded as atrocious and utterly intolerable in a civilized community.

151.    If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for intentional infliction of emotional distress.

152.    Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to the Plaintiff for his claims under Maryland law.

153.    The aforesaid actions and omissions of Deputy Mash directly and proximately caused Plaintiff to suffer severe emotional distress, fear and terror, mental anguish, and pain and suffering.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, in his individual capacity, demands judgment against the United States in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT VIII

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Negligence**

**(The Estate of Hamed Delcheh v. the United States of America)**

154.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

155.    At all times relevant hereto, Deputy Mash and the other task force officers had a duty to conduct themselves in a reasonable manner, use reasonable force, use de-escalation tactics and use less-than-lethal weapons before using deadly force, refrain from using deadly force on an unarmed fleeing subject, and to provide a verbal warning before using such deadly force when executing the aforesaid arrest warrant for Hamed Delcheh.

156.    Deputy Mash breached this duty of care when he failed to act reasonably, failed to use reasonable force, failed to use de-escalation tactics or otherwise equip himself with less-than-lethal weapons, and instead deployed his service firearm without warning eight times in three seconds on a fleeing subject who did not pose an imminent threat.

157.    If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for negligence.

158.    Because Defendant Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to the Estate of Hamed Delcheh for its claims under Maryland law.

159.    The aforesaid actions and omissions of Defendant Mash directly and proximately caused damages to Hamed Delcheh in the form of significant bodily injuries, pain and suffering, fright and terror, severe emotional distress, loss of dignity, and, ultimately, his untimely death.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as the Personal Representative of the Estate of Hamed Ghorouni Delcheh, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

**COUNT IX**

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Negligence**

**(Plaintiff Ebrahim Ghorouni Delcheh, in his Individual Capacity v. The United States of America)**

160.    Plaintiff hereby incorporates the preceding paragraphs as if restated fully herein.

161.    At all times relevant hereto, Defendant Deputy Mash and the other task force officers had a duty to conduct themselves in a reasonable manner, use reasonable force, use de-escalation tactics and use less-than-lethal weapons before using deadly force, not to use deadly force on an unarmed fleeing subject, and to provide a verbal warning before using deadly force when executing the aforesaid arrest warrant for Hamed Delcheh.

162.    Deputy Mash breached this duty of care when he failed to act reasonably, failed to use reasonable force, failed to use de-escalation tactics or otherwise equip himself with less-than-lethal weapons, and instead deployed his firearm without warning eight times in three seconds on a fleeing subject who did not pose an imminent threat.

163.    Deputy Mash further breached his duty of care when he deployed his service firearm multiple times in the close proximity to and in the direction of a bystander (Mr. Delcheh).

164.    If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for negligence.

165.    Because Deputy Mash acted within the scope of his deputization as a member of the U.S. Marshals Capital Area Regional Fugitive Task Force, the United States is liable to Plaintiff for his claims under Maryland law.

166.    The aforesaid actions and omissions of Deputy Mash directly and proximately caused damages to Plaintiff in the form of bodily injuries, pain and suffering, and severe emotional distress.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, in his individual capacity, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT X

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Gross Negligence**

**(The Estate of Hamed Delcheh v. the United States of America)**

167.    Plaintiff hereby incorporates the preceding paragraphs as if restated fully herein.

168.    At all times relevant hereto, Defendant Deputy Mash and the other task force officers had a duty to conduct themselves in a reasonable manner, use reasonable force, use de-escalation tactics and use less-than-lethal weapons before using deadly force, and to provide a verbal warning before using such deadly force when executing the aforesaid arrest warrant for Hamed Delcheh.

169.    Deputy Mash grossly, willfully, and recklessly breached his aforesaid duties when he failed to act reasonably, failed to use reasonable force, failed to use de-escalation tactics or

otherwise equip himself with less-than-lethal weapons, and instead deployed his service firearm without warning eight times in three seconds on a fleeing subject who posed no imminent threat.

170.    If the United States were a private person, it would be liable to the Estate of Hamed Delcheh under the laws of the State of Maryland for gross negligence.

171.    Because Defendant Mash acted within the scope of his deputization as a member of CARFTF, the United States is liable to the Estate for its claims under Maryland law.

172.    The aforesaid actions and omissions of Defendant Mash directly and proximately caused damages to Hamed Delcheh in the form of bodily injuries, pain and suffering, fright and terror, severe emotional distress, loss of dignity, and ultimately, his untimely death.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, as Personal Representative of the Estate of Hamed Delcheh, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## COUNT XI

**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80**
**Gross Negligence**

**(Plaintiff Ebrahim Ghorouni Delcheh, in his Individual Capacity v. The United States of America)**

173.    Plaintiff hereby incorporates all preceding paragraphs as if restated fully herein.

174.    At all times relevant hereto, Defendant Deputy Mash and the other task force officers had a duty to conduct themselves in a reasonable manner, use reasonable force, use de-escalation tactics and use less-than-lethal weapons before using deadly force, and to provide a verbal warning before using such deadly force when executing the aforesaid arrest warrant for Hamed Delcheh.

27

175.     The aforesaid duties were grossly, willfully, and recklessly breached by Deputy Mash when he failed to act reasonably, failed to use reasonable force, failed to use de-escalation tactics or otherwise equip himself with less-than-lethal weapons, and instead deployed his firearm without warning eight times in three seconds on a fleeing subject who posed no imminent threat.

176.     Deputy Mash further grossly, willfully, and recklessly breached his duties by firing his service revolver multiple times in the close proximity to and in the direction of a bystander (Mr. Delcheh).

177.     If the United States were a private person, it would be liable to Plaintiff under the laws of the State of Maryland for gross negligence.

178.     Because Deputy Mash acted within the scope of his deputization as a member of CARFTF, the United States is liable to Plaintiff for his claims under Maryland tort law.

179.     The aforesaid actions and omissions of Defendant Mash directly and proximately caused damages to Plaintiff in the form of bodily injuries, pain and suffering, and severe emotional distress.

WHEREFORE, Plaintiff Ebrahim Ghorouni Delcheh, in his individual capacity, demands judgment against the United States of America in an amount to be determined at trial, plus interest, costs, injunctive relief, and any other such relief as the Court deems proper.

## PRAYER FOR RELIEF

Plaintiff Ebrahim Ghorouni Delcheh, Individually and as Personal Representative of the Estate of Hamed Delcheh respectfully prays the following:

(a) Plaintiff and the Estate of Hamed Delcheh be awarded actual damages from Defendants in amounts to be shown at trial;

(b) Plaintiff and the Estate of Hamed Delcheh be awarded all medical, doctor, funeral, and other expenses in an amount to be proven through the evidence at the time of trial;

(c) Plaintiff and the Estate of Hamed Delcheh be awarded all general, special, compensatory, economic, and other allowable damages, including punitive damages, as permitted under applicable law;

(d) The Estate of Hamed Delcheh be awarded all damages for the wrongful death of the Plaintiff's decedent, Hamed Delcheh, in accordance with Md. Cts & Jud. Proc. § 3-904, *et seq.*

(e) Plaintiff be awarded attorneys' fees and costs; and

(f) Plaintiff be afforded such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial as to all counts so triable.

Respectfully Submitted,

/s/ *Drew LaFramboise*
Veronica Nannis (#15679)
Drew LaFramboise (#20288)
Lacey McMullan (*pro hac vice anticipated*)
**Joseph, Greenwald & Laake, P.A.**
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770-1417
Ph: (240) 553-1209
F: (240) 553-1740
vnannis@jgllaw.com
dlaframboise@jgllaw.com
lmcmullan@jgllaw.com

Thomas W. Keilty (#18992)
**Keilty Bonadio**
One South Street
1 South Street, Suite 2125

Baltimore, MD 21202
(410) 469-9953
tkeilty@kblitigation.com

*Counsel for Plaintiff*